# Staunton

STANDARD OIL COMPANY OF NEW JERSEY AND JAMES H. GROSECLOSE V. MABEL COX.

September 19, 1935.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Chinn and Eggleston, JJ.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore,* for the plaintiffs in error.

*D. F. Kennedy* and *A. A. Skeen,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This writ of error brings under review the proceedings in the trial of a tort action in which plaintiff was awarded a verdict and judgment in the sum of $1,500.

Defendants in the trial court assign four errors. It is necessary, in our view of the case, to consider only one question presented in the petition; namely, the refusal of the trial court to set aside the verdict, on the ground that plaintiff failed to prove defendants were guilty of a breach of any duty they, or either of them owed to her.

On January 16, 1934, plaintiff in an attempt to start a fire, in her Heatrola furnace, with which her dwelling is equipped, poured from a gallon tin can, some coal oil on the wood in the furnace box. She held the can in her left hand, close to and in front of the furnace door, and with her right struck a match and threw it on the wood; an explosion followed, bursting the can in her hand, and scattering some of its contents on her person. As a result she received severe and painful burns on her face, neck, and body. The gallon of oil, which was originally in the can, was purchased on January 5, 1934, from one Eugene Bowman, her brother, who is a merchant in Wise county. This kerosene was drawn from a fifty-five gallon container kept by Bowman in his store. On January 3, 1934, forty gallons of kerosene had been delivered to Bowman and placed in this container by James H. Groseclose, one of defendants, and the local distributor of oil, gasoline and other products manufactured by the Standard Oil Company of New Jersey, the other defendant.

The notice of motion alleged, that it was the duty of defendants to furnish their patrons and customers desir-

ing to use kerosene oil, for lighting lamps, starting fires, and other domestic purposes, a product reasonably safe and suitable therefor, with a flash point not lower than 115 degrees Fahrenheit, and that defendants had breached this duty by selling and delivering to Eugene Bowman, from whom plaintiff purchased it, a mixture of kerosene and gasoline, highly inflammable and wholly unsuited to the purposes stated, and with a flash point as low as fifty degrees Fahrenheit.

On the date of the accident, Bowman at the request of plaintiff's husband, drew one-half gallon of the liquid remaining in the fifty-five gallon container into a glass jar; he placed the jar, unsealed, behind the counter in his store, where it remained until sometime in February following. It was then sealed, and sent to the Department of Agriculture, in Richmond, marked, "For analysis to determine gasoline content." The analysis of this sample, by the state chemist, showed that the liquid was a mixture of kerosene and gasoline, or some other inflammable material with a flash point at fifty degrees Fahrenheit. It is conceded that such a mixture is not suitable, or safe, to be used in lamps or for starting fires. In the presence of the state chemist, and attorneys for plaintiff, some of this same fluid was taken from the container and given to W. L. Moody, a chemist employed by the city of Richmond, who by analysis, found that the liquid was highly inflammable and flashed at the same point that was found by the state chemist. This evidence conclusively established the fact that the liquid analyzed by the two chemists was highly explosive, and wholly unsuited for the use for which plaintiff had purchased it.

The difficulty in the case, from the plaintiff's point of view, is that she failed to prove that the liquid sold by defendant to Bowman, was the same, or had the same content, as the sample delivered to the Department of Agriculture, and analyzed by the two chemists as set out above. This appears from the following uncontradicted evidence.

The Standard Oil Company, maintains at Coeburn, Wise county, tanks for gasoline and kerosene, from which tanks Groseclose gets the products, and distributes them to his customers by truck. The body of this truck is divided into four compartments; compartment number four has a capacity of eighty-eight gallons and is generally used for the transportation and delivery of kerosene from the storage tanks, to customers. The other three compartments are generally used for like transportation and delivery of gasoline. Since June 1933, defendants have stored, in the tanks at Coeburn, only two types, or kinds of gasoline, known to the trade as "Esso" and "Essolene." A chemical dye is used in both, to color the former red, and the latter orange or brown; both contain lead. The kerosene delivered from the tank at Coeburn is pure water white color. It follows that if either gasoline known as "Esso," or that known as "Essolene," became mixed with the kerosene, the color of the latter would be materially changed, and an analysis of the mixture would reveal the presence of the chemical dye and lead. The state chemist made no attempt to determine whether the chemical dye or lead was present in the sample analyzed by him. But Mr. Moody did make such analysis, and found no trace of either in the sample. This conclusively establishes the fact that no "Esso" or "Essolene" gasoline, was mixed with the kerosene in the sample sent by the plaintiff to the Department of Agriculture.

The kerosene storage tank in Coeburn was filled from a railroad tank car in December 1933. On January 3, 1934, Groseclose filled compartment number four in his truck with eighty-eight gallons of kerosene drawn from the Coeburn storage tank, and compartment number two with 254 gallons of "Essolene," and began deliveries to his customers. He delivered all of the "Essolene" before he reached Bowman's store, there he transferred forty gallons of kerosene from his supply of eighty-eight gallons, from the truck to the fifty-five gallon container owned by Bowman. This transfer was made by drawing the kero-

sene from the truck into two five gallon cans, and then pouring the contents of the can into Bowman's storage container. That container was shaped like a barrel, and was designed, and formerly used as a motor oil tank, equipped with a pump forcing out a quart of liquid at a stroke. Groseclose testified that there was some liquid in Bowman's tank before he poured any of the kerosene therein—just how much, he could not state. He believed, however, that just five gallons more than the forty gallons would have filled it. The kerosene was plainly visible as it came from the truck into the five gallon cans, in the cans, and as it was poured from the cans into Bowman's tank. No discolorization was noticeable.

Groseclose, from Bowman's store, returned to Coeburn, and there put forty gallons of kerosene into compartment number four, thereby filling it, filled his other compartments with gasoline, and started on the second round of deliveries. The eighty-five gallons of kerosene was delivered to the Virginia Iron, Coal and Coke Company. That company's storage tank for kerosene held 120 gallons, which was filled on the average of once a week. This store was burned on January 28, or 29, 1934. The manager, however, testified that he believed he had sold all the eighty-eight gallons before the store burned and that he had received no complaint about the kerosene from any of his customers. Other deliveries were made from the same storage tank at Coeburn, and no complaint of the purity of the kerosene had been registered with Groseclose, or the Standard Oil Company.

Shortly after the accident Groseclose, at the request of Bowman, removed the remaining kerosene from the fifty-five gallon container, and found that seventeen gallons had not been sold. A sample was taken from this seventeen gallons, and another sample taken from the kerosene storage tank at Coeburn. Both were sent under seal, to W. L. Moody, to be analyzed. The analyses of both samples were the same, both would flash at 115 degrees Fahrenheit. There was a total absence of chemical dyes

and lead, the only difference being the color of the sample drawn from the seventeen gallons was somewhat "muddy." Moody testified that the discolorization was very probably due to the mixture of the kerosene with the lubricating motor oil, traces of which were left in the fifty-five gallon container when it began to be used as a storage tank for kerosene.

Plaintiff testified that she and her husband had used the kerosene purchased on January 5, from the date of the purchase to the date of the accident, for the purpose of starting fires and lighting lamps, and that results were satisfactory until the accident on the morning of January 16. On that day one of the lamps generally used by the family, was filled with kerosene from the gallon tin can, which left in the can only about a cup and one-half, at the time of the explosion. Instead of taking a sample from the lamps, to be analyzed, plaintiff and her husband, took a sample from the container in Bowman's store, and there left it unsealed for nearly four weeks before it was analyzed. Both chemists testified that it would have been very dangerous to have used the liquid sent to the Department of Agriculture, by the plaintiff, for starting fires or lighting lamps. Moody was asked what would happen if that fluid were in an ordinary coal oil lamp and a lighted match were applied to the wick.

"A. My opinion would be the light would follow the wick, run back down into the base of the lamp, where the oil was stored, and vapors begin to arise and have an explosion.

"Q. Would that be instantaneous?

"A. I think it would be quicker than the eye could visualize it."

From the uncontradicted evidence, the conclusion is irresistible that the sample drawn by Bowman and sent to the Department of Agriculture, and analyzed by both Moody and the state chemist, was not a fair sample of the kerosene sold to Bowman. When the analyses of this

sample are eliminated, the record contains no proof that defendants were guilty of any breach of duty that they, or either of them, owed plaintiff.

For the reasons stated, the judgment of the trial court is reversed, the verdict of the jury set aside, and final judgment will be entered for defendants.

*Reversed and final judgment.*